**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| ELLY GROSS, et. al., | : |
|     Plaintiffs, | :    Civ. No. 02-2936(DRD) |
|     v. | :    **O P I N I O N** |
| THE GERMAN FOUNDATION INDUSTRIAL INITIATIVE; and ALLIANZ AG; BASF AG; BAYER AG; BMW AG; COMMERZBANK AG; DAIMLERCHRYSLER AG; DEGUSSA-HULS AG; DEUTSCHE BANK AG; DEUTZ AG; DRESDENER BANK AG; HOECHST AG; RAG AG; ROBERT BOSCH GmbH; SIEMENS AG; VEBA AG; THYSSENKRUPP AG; and VOLKSWAGEN AG, jointly and severally in their respective capacities as principals, founders, and alter egos of the GERMAN FOUNDATION INDUSTRIAL INITIATIVE, | : |
|     Defendants. | : |

ELLY GROSS, et. al.,

    Plaintiffs,

    v.

THE GERMAN FOUNDATION INDUSTRIAL INITIATIVE; and ALLIANZ AG; BASF AG; BAYER AG; BMW AG; COMMERZBANK AG; DAIMLERCHRYSLER AG; DEGUSSA-HULS AG; DEUTSCHE BANK AG; DEUTZ AG; DRESDENER BANK AG; HOECHST AG; RAG AG; ROBERT BOSCH GmbH; SIEMENS AG; VEBA AG; THYSSENKRUPP AG; and VOLKSWAGEN AG, jointly and severally in their respective capacities as principals, founders, and alter egos of the GERMAN FOUNDATION INDUSTRIAL INITIATIVE,

    Defendants.

Civ. No. 02-2936(DRD)

**O P I N I O N**

----

Barbara Schwartz Lee and Bernard Lee

    Plaintiffs,

    v.

Deutsche Bank, AG, and Dresdner Bank, AG,

    Defendants.

Civ. No. 03-3181(DRD)

----

Allyn Z. Lite, Esq.
LITE DEPALMA GREENBERG & RIVAS, LLC
Two Gateway Center, 12th Floor
Newark, New Jersey 07102

Burt Neuborne, Esq.
40 Washington Square South
New York, New York 10012

Milberg Weiss, Esq.
Melvyn I. Weiss, Esq.
One Pennsylvania Plaza
New York, New York 10019
        Attorneys for Plaintiffs, Elly Gross, et al.

Lisa J. Rodriguez, Esq.
TRUJILLO RODRIGUEZ & RICHARDS, LLC
8 Kings Highway West
Haddonfield, New Jersey 08033

Michael D. Hausfeld, Esq.
Agnieszka Frysman, Esq.
Hillary Ratway, Esq.
George Farah, Esq.
COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.
West Tower, Suite 500
1100 New York Avenue, N.W.
Washington, D.C. 20005-3964
        Attorneys for Plaintiffs, Barbara Schwartz Lee
        and Bernard Lee

John J. Gibbons, Esq.
Terry Myers, Esq.
Thomas R. Valen, Esq.
Jeffrey L. Nagel, Esq.
GIBBONS, P.C.
One Gateway Center
Newark, New Jersey 07102-5310
        Defense Liaison Counsel,
        Counsel for Defendants, Degussa AG, Thyssen Krupp AG;
        Local Counsel for Allianz AG,
        BASF AG, Bayer AG, Commerzbank AG,
        Deutsche Bank AG, Deutz AG,
        Dresdner Bank AG, RAG AG,
        Robert Bosch GmbH

Neil McDonnell, Esq.
Brian E. McGunigle, Esq.

Deirdre Sheridan, Esq.
DORSEY & WHITNEY LLP
250 Park Avenue
New York, New York 10177
     Counsel for Defendant, Robert Bosch GmbH

Daniel Gsvoski, Esq.
Ian Ceresney, Esq.
HERZFELD & RUBIN, P.C.
40 Wall Street
New York, New York 10005
     Counsel for Defendant Volkswagen AG

Jeffrey L. Chase, Esq.
CHASE KURSHAN HERZFELD & RUBIN, LLC
5 N Regent Street
Livingston, New Jersey 07039-1617
     Local Counsel for Defendant Volkswagen AG

Bud G. Holman, Esq.
Paul Doyle, Esq.
KELLEY DYE & WARREN LLP
200 Kimball Drive
Parsippany, New Jersey 07054
     Local Counsel for Defendant, Daimler Chrysler AG

Brant W. Bishop, Esq.
Susan Engel, Esq.
Oreste P. McClung, Esq.
KIRKLAND & ELLIS LLP
655 15th Street, NW
Washington, DC 20005
     Counsel for Defendant, Siemens AG

Keith G. Von Glahn, Esq.
WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP
33 Washington Street
Newark, New Jersey 07102-5311
     Local Counsel for Defendant, Siemens AG

Thomas M. Mueller, Esq.
Mark D. McPherson, Esq.

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104-0050
     Counsel for Defendant, BASF

Jeffrey Barist, Esq.
Sander Bak, Esq.
J. Ryan Miller, Esq.
MILBANK, TWEED, HADLEY & McCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
     Counsel for Defendants Deutsche Bank AG
     and Dresdner Bank AG

Konrad L. Cailteux, Esq.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
     Counsel for Defendant Bayerische
     Motoren Werke AG

Rosemary J. Bruno, Esq.
KLETT ROONEY LIEBER & SCHORLING, P.C.
550 Broad Street, Suite 810
Newark, New Jersey 07102
     Local Counsel for Defendant, Bayerische
     Motoren Werke AG

Roger M. Witten, Esq.
Louis R. Cohen, Esq.
John A. Trenor, Esq.
David W. Bowker, Esq.
WILMER CUTLER PICKERING HALE and DORR LLP
399 Park Avenue
New York, New York 10022
     Counsel for Defendants, Allianz SE, Bayer AG,
     Commerzbank AG, Deutz AG, and RAG AG

Eric M. Rubin, Esq.
Walter E. Diercks, Esq.
Max Riederer von Paar, Esq.
RUBIN, WINSTON, DIERCKS, HARRIS & COOKE, LLP
1155 Connecticut Ave., NW, Suite 600

Washington, DC 20036
      Attorneys for Amicus Curiae
      Federal Republic of Germany

**Debevoise, Senior District Judge**

## Table of Contents

|  |  | Page |
|---|---|---|
| I. | Introduction | 6 |
| II. | Background | 10 |
| III. | Procedural History | 23 |
| IV. | Gross Plaintiffs' Summary Judgment Motion | 28 |
| | A. <u>Gross</u> Plaintiffs' Contentions | 28 |
| | B. Evidence upon which <u>Gross</u> Plaintiffs Rely | 32 |
| V. | <u>Schwartz Lee</u> Summary Judgment Motion | 42 |
| | A. <u>Schwartz Lee</u> Plaintiffs' Contentions | 42 |
| | B. Evidence upon which <u>Schwartz Lee</u> Plaintiffs Rely | 44 |
| VI. | Defendants' Motions | 62 |
| | A. Defendants' Motion to Dismiss Both Complaints | 62 |
| | B. Banks' Motion to Dismiss <u>Schwartz Lee</u> Complaint | 64 |
| | C. Evidence upon which Defendants' Rely | 66 |
| VII. | Federal Republic of Germany, Amicus | 83 |
| | A. Contentions of Federal Republic of Germany | 83 |
| | B. Evidence upon which Germany Relies | 87 |
| VIII. | Discussion | 88 |

5

A.  Status of Joint Statement ..................................................... 88

B.  Gross Case Motions ........................................................... 97

   1.  Summary Judgment Standards ....................................... 98

   2.  Joint Statement Ambiguity ........................................... 99

   3.  December, 1999, Understanding .................................... 102

   4.  March, 2000, "Interest" Agreement ................................ 108

   5.  Post March, 2000, Negotiations .................................... 112

C.  Schwartz Lee Case Motions ................................................ 120

IX.  Conclusion ...................................................................... 124

   Appendix - Para. 11-15 Roger M. Witten Declaration .............. 126

## I. Introduction

July 17, 2000, was the occasion of one of the most remarkable diplomatic achievements since the end of World War II.  The efforts of two extraordinary diplomats, Secretary Stuart E. Eizenstat, representing the United States, and Count Otto Lambsdorff, representing the Federal Republic of Germany, had, after approximately 19 months of negotiations, secured the signing of two documents that would lead to the creation of the Foundation, "Remembrance, Responsibility and Future" (the "Foundation"), to compensate the victims for wrongs against them committed by German companies during the Nazi-era and to provide an exclusive forum in which the victims could assert their claims.

The documents were i) the Joint Statement on Occasion of the Final Plenary Meeting Concluding International Talks on the Preparation of the Foundation, "Remembrance,

Responsibility, and the Future" (the "Joint Statement") and ii) Agreement between the Government of the Federal Republic of Germany and the Government of the United States of America concerning the Foundation "Remembrance, Responsibility and the Future" (the "Executive Agreement"). Shortly thereafter, the German Bundestag enacted a Law on the Creation of a Foundation "Remembrance, Responsibility and Future" (the "Foundation Law") that, among other things, established the Foundation as a German sovereign instrumentality and as the "exclusive remedy and forum" for resolution of claims against German companies arising out of the Nazi-era and World War II. Collectively those instruments were called the "Berlin Accords."

These two diplomats had mediated so successfully that the Joint Statement was signed by six eastern European countries, Israel, Germany, the United States, seventeen German companies that had established the German Economy Foundation Initiative ("GEFI" or the "Initiative"), the Conference on Jewish Material Claims Against Germany, Inc., and class-action attorneys representing plaintiffs in some of the then pending United States lawsuits against German companies on account of Nazi-era depredations. The Joint Statement provided, among other significant provisions, that DM 10 billion contributed by the German Government and German companies was to be distributed to former National Socialist slave and forced laborers, for other personal injury, for damages to property and for a Future Fund to fund ongoing projects to prevent religious and ethnic intolerance in Germany.

The Joint Statement provided that the DM 5 billion contribution of the German companies "shall be due and payable to the Foundation and payments from the Foundation shall begin once all lawsuits against German companies arising out of the National Socialist era and

World War II pending in U.S. courts . . . are finally dismissed with prejudice by the courts." The initial portion of the DM 5 billion German Government contribution was to be made available to the Foundation by October 31, 2000. The remainder of the German Government contribution was to be made available to the Foundation by December 31, 2000. Para. 4(d) of the Joint Statement concluded: "German company funds will continue to be collected on a schedule and in a manner that will ensure that the interest earned thereon before and after their delivery to the Foundation will reach at least 100 million DM."

There was an unexpected delay in obtaining dismissal with prejudice of all the pertinent lawsuits against German companies in the United States courts, and it was not until May 30, 2001, that the Bundestag announced that adequate legal security had been achieved, purporting thereby to trigger the time for the German companies' payment called for by Para. 4(d) of the Joint Statement.

The German Government made its payments in a timely manner. On various occasions after the May 30, 2001 Bundestag announcement, the German companies paid, according to GEFI (but disputed by Plaintiffs), DM 5.1 billion to the Foundation. The Foundation is fully organized and is carrying out its important humanitarian work compensating victims and is pursuing the functions of the Future Fund.

Notwithstanding this felicitous state of affairs, a dispute has arisen between the Plaintiffs in the two cases pending before the Court, who are victims entitled to compensation from the Foundation, and the German companies that were the members of GEFI. Plaintiffs contend that the German companies have failed to comply with their obligations under Para. 4, and, in particular, to pay to the Foundation the interest specified in that paragraph. It is the Plaintiffs'

contention that this language contains no ceiling and requires the companies to pay interest on all funds the Initiative collected from the time of their receipt of those funds until payment to the Foundation, or in the alternative, to pay interest on the companies' share from December, 1999.

The Gross Plaintiffs differ from the Schwartz Lee Plaintiffs about the period for which interest is owing, and the Gross Plaintiffs take different positions at different times and places as to the period for which interest is owing. The Schwartz Lee Plaintiffs argue that this obligation to pay interest is on the entire DM 10 billion (or at least the companies' DM 5 billion), running from December 14, 1999, when agreement was reached on the DM 10 billion, or from December 17, 1999, when the participants in the negotiations announced their agreement upon the DM 10 billion figure. Occasionally the Gross Plaintiffs seem to adopt the Schwartz Lee position, but on the present motions they argue primarily (but not exclusively) that the obligation to pay interest commenced on July 17, 2000, the date of signing the Joint Statement.

The German companies contend that the additional DM 100 million was a fixed amount to be added to the DM 10 billion cap to enable the representatives of the victims to reach agreement on the allocation of the DM 10 billion capped amount.

Having reviewed the full record submitted in connection with the pending motions as well as the briefs and arguments of counsel, the court concludes as follows:

1. The Joint Statement is a political document that does not confer upon the signatories, or any portion of them, contractual rights which can be enforced in United States courts. Consequently, Defendants' motion to dismiss each of these cases should be granted.

2. In the alternative, were the Joint Statement found to create contractual obligations between Plaintiffs and the Defendants, enforceable in United States courts, Para. 4(d) concerning

9

interest is ambiguous, requiring resort to the history of the negotiations to determine its meaning.

3.  The history of the negotiations of the Berlin Accords establishes, as the Defendants contend, i) in December, 1999, the negotiating parties reached an understanding that the German Government and the German companies would pay into the Foundation a capped amount of DM 10 billion in exchange for "legal peace" with no agreement to pay interest; ii) in March, 2000, the negotiating parties reached an understanding that GEFI would pay an additional DM 100 million denominated as "interest" in order to enable the victim groups to reach agreement on the allocation of the DM 10 billion, but there was no other commitment on the part of the German companies to pay interest in addition to the DM 100 million; between March, 2000, and July 17, 2000, when the Joint Statement was executed, Secretary Eizenstat and the Plaintiffs' attorneys made repeated demands that the German companies pay interest on their DM 5 billion share of the DM 10 billion total sum.  All of these demands were rejected, and as a consequence Para. 4(d) of the Joint Statement cannot be construed as requiring the German companies to pay to the Foundation more than DM 5.1 billion.

4.  If this court has authority under the Joint Statement to do so, it would construe the Joint Statement as not requiring the German companies to pay the Foundation more than DM 5.1 million and deny the summary judgment motions of the Gross and Schwartz Lee Plaintiffs and grant summary judgment to the Defendants, dismissing both complaints on the merits.

## II. Background

A.  Litigation:  On March 13, 1996, the German Federal Constitutional Court decided Krakauer v. Federal Republic of Germany, Federal Constitutional Court, Bul 33/93 (March 13, 1996), a decision that was widely interpreted to lift the bar on World War II era claims against

German industry imposed by the London Debt Agreement of 1953.  In March, 1998, plaintiffs in the Gross case filed Iwanowa v. Ford Motor Co., 67 F. Supp. 2d 424 (D.N.J. 1999), seeking redress for the widespread use of slave labor by German industry during the Nazi period. Iwanowa was followed by the filing of Burger-Fischer v. Degussa AG, 65 F. Supp. 2d 248 (D.N.J. 1999), and more than 60 additional cases throughout the United States.  These cases took different forms, including class actions and single plaintiff cases, and dealt with issues other than slave and forced labor, including insurance policies and bank deposits.

In August, 1998, twelve German companies (later joined by five other funding members) formed GEFI.  Dr. Manfred Gentz, then CFO of Daimler/Chrysler, and Dr. Michael Jansen, then Executive Vice-President of Degussa, played leading roles in the establishment of GEFI.  GEFI was German industry's response to the proliferation of class actions and other lawsuits in the United States against German companies.  It sought to obtain all-embracing and enduring legal peace for German companies by establishing and funding a German Foundation for making payments to certain victims of the National Socialist era and World War II that would be an instrumentality of the Federal Republic of Germany, governed by German institutions and not subject to oversight or review by United States courts.

On or about September 8, 1998, members of GEFI met with Chancellor-elect Gerhard Schroeder to seek support of the German Government for GEFI's objectives, including resolution of the World War II related litigation against German industry pending in the United States. After that meeting, representatives of GEFI and the German government met with Secretary Stuart E. Eizenstat, then United States Assistant Secretary of State, and sought the assistance of the United States government in resolving the litigation.  Secretary Eizenstat entered into

discussions with German officials concerning the establishment of one or more funds and helping the German companies obtain legal peace from lawsuits in the United States courts.

On December 14, 1998, Bodo Holmbach, Chancellor Schroeder's chief of staff, and the German ambassador to the United States met with Secretary Eizenstat. They stated that Germany wanted to settle not only the slave labor claims but all other claims against German companies, including those against the banks and insurance companies. Mr. Holmbach officially asked Secretary Eizenstat to work with the German government and industry to resolve the class actions. Secretary Eizenstat agreed to do so as long as the class action lawyers also agreed. He persuaded the Germans that, in addition, the negotiations should include the Eastern European countries, whose forced workers had never been paid, the State of Israel, and the Conference on Jewish Material Claims Against Germany (the "Claims Conference"). During the negotiations that followed, Mr. Holmbach first represented the German government and was succeeded by Count Otto Lambsdorff.

On or about February 8, 1999, the first negotiating session between GEFI and certain plaintiffs' counsel took place at the State Department. Plaintiffs' counsel urged the use of the Federal Rules of Civil Procedure to resolve the pending litigation. GEFI rejected the use of Rule 23, refusing to accept continued involvement of the United States courts and insisting that the institutions established to provide recompense had to be German and not subject to American oversight. On February 16, 1999, Chancellor Schroeder and twelve German companies released a statement confirming the German companies' intention to fund a private foundation that would make payments to former forced and slave laborers and other victims of National Socialism.

On or about May 12, 1999, the first plenary negotiating session was held in Washington,

12

D.C., involving: i) numerous private lawyers (including Melvin I. Weiss, Esq., Michael D. Hausfeld, Esq., Morris Ratner, Esq., and Professor Burt Neuborne, who acted as spokesmen for the victims; ii) the German defendants acting through GEFI; iii) the Claims Conference; and representatives of six nations with large victim populations - Belarus, Czech Republic, Israel, Poland, Russia, and Ukraine.  The session was co-chaired by Mr. Holmbach and Secretary Eizenstat.  GEFI and the German government ruled out a United States-style court supervised class action settlement.

As recounted by Secretary Eizenstat: "The first plenary session like the dozen or so that followed over more than a year, were occasions to make set speeches with maximum demands. The real negotiations took place in small meetings outside the formal sessions, with the plenaries nevertheless bestowing on all parties a sense of involvement."  Stuart E. Eizenstat, Imperfect Justice 229 (Public Affairs Press 2003).

On or about June 22, 1999, the second plenary negotiating session took place in Bonn. The participants discussed the use of a German Foundation and the use of an Executive Agreement between Germany and the United States as a means of achieving legal peace.  On or about July 23, 1999, the third plenary negotiating session took place in Washington, D.C., at which Count Lambsdorff replaced Mr. Holmbach.  Agreement in principle was reached on the use of a German Foundation and an Executive Agreement.

The Fourth Plenary session took place on or about August 22-24, 1999, and discussions commenced concerning the size of the Foundation.  Various plaintiffs attorneys had been voicing different, but uniformly high, demands, e.g., DM 60 billion, and GEFI was suggesting a dramatically lower amount - DM 1.7 billion.  (Id. at 240-41).  This put Secretary Eizenstat's

13

negotiating skills to a supreme test.

On or about September 6, 1999, the CEOs of the then-16 companies constituting GEFI met with Chancellor Schroeder and agreed to increase GEFI's offer and the German Government agreed to participate.  Secretary Eizenstat had persuaded President Clinton to communicate personally with Chancellor Schroeder in an effort to obtain a more substantial commitment by the German companies and the German Government.  He had been thinking in terms of a total commitment of DM 10 billion.  As a result, two weeks after GEFI's September 6 meeting with the Chancellor, GEFI raised its offer from DM 1.7 billion to DM 4 billion, and the Chancellor proposed a DM 2 billion in government funds for a total of DM 6 billion.  (Imperfect Justice at 242-43).

This has been a somewhat bloodless account of the discussions and controversies that took place between the various participants.  Secretary Eizenstat's Imperfect Justice portrays the charged nature of these interchanges and relates how his and Count Lambsdorff's crucial and continuing interventions prevented the negotiations from collapsing.  After the October offer of DM 6 billion from the German side, Secretary Eizenstat's primary efforts were devoted to seeking an increase in this amount and persuading the representatives of the victims to reduce their demands.  He concluded that the principal source of additional funds would have to be the German Government and turned once again to President Clinton.  In a November 13, 1999, letter to the Chancellor, the President stated that Secretary Eizenstat was acting as his personal representative in insisting that the Germans contribute a total of at least DM 10 billion and that there needed to be "'a significant increase in the contributions from German companies beyond their opening offer of four billion D-marks' and a willingness by the German Government to

14

increase its two billion D-mark contribution, even if spread over two fiscal years.'"  At that point,

Count Lambsdorff  informed Secretary Eizenstat that the best that could be achieved was a total

of DM 8 billion.  (Imperfect Justice at 248-49).

Various of the victims' lawyers made impossibly high demands and feelings ran high on

all sides.  Secretary Eizenstat succeeded in obtaining a range of DM 6 billion to DM 10 billion

from the German side and DM 10 billion to DM 15 billion from the victims and their lawyers.

(Id., at 250-51).  He was, however, confronted by the German Government's refusal to move

from its "absolute maximum" of DM 3 billion by another DM 2 billion.  Thus, the German

position remained fixed at DM 8 billion.  As Secretary Eizenstat expressed it, "[t]he Germans

suspected that even if they agreed to settle at 10 billion, it would be only a temporary way station

to some higher demand."  (Id. at 252-53).

Secretary Eizenstat then turned to the class action attorneys and ultimately persuaded

them to drop their range to DM 10 billion to DM 11 billion.  He then broached his "creative

accounting" approach, upon which the Schwartz Lee and Gross plaintiffs rely so heavily.

> I then engaged in what I could only call creative accounting.  I persuaded
> Lambsdorff and Gentz to add interest that would be earned on the money while
> we were getting the cases dismissed and setting up the foundation, that would now
> be one joint private section-federal government organization.  They ended up
> agreeing to pay at least 100 million DM in interest.  But the most ambitious was
> my idea to create a "mirror image" fund for the dozens of American companies
> whose big German subsidiaries had employed slave labor.  According to a 1943
> Treasury Department list, the most celebrated names included Ford, General
> Motors, Gillette, IBM, and Kodak, among many others.

(Id. at 254).

This plan did not come to fruition.  Not surprisingly, the American companies were not

interested in participating and, as Secretary Eizenstat stated, "[a]ll my creative accounting still

could not bridge the gap, with the Germans stuck at 8 billion and the lawyers at 11 billion."
(Imperfect Justice at 255).  In early December, the lawyers were backtracking, raising their
demands.  However, Count Lambsdorff approached Secretary Eizenstat and told him that
"whatever Schroeder might be saying about sticking to 8 billion marks, if [Eizenstat] could
organize a unified front from the victims for a settlement of 10 billion marks, the chancellor
would rethink his position."  (Id. at 255-56).

       Secretary Eizenstat described what happened next:

> [Obtaining an organized front from the victims] would be no easy task with that
> fractious coalition.  Singer [of the Jewish Claims conference] said that he, Weiss,
> Neuborne, Swift, and Fagan could accept 10 billion, but Hausfeld was the
> holdout.
>
> I went back to Hausfeld and urged him to be a statesman.  He now held the
> agreement in his hands, I said.  After a long pause he said, "Okay."  But getting to
> 10 billion marks was not so simple.  A few days later, Hausfeld, Weiss, and
> Neuborne marched into my office and announced they had reached a consensus.
> Hausfeld crowed proudly that they all would settle at 10.5 billion DM plus the
> additional costs of administering the foundation.  I blew up at them, practically
> shouting, "You're going to screw it all up over 500 million."  They asked to
> rethink the matter and marched out.
>
> Neuborne and Hausfeld called later in the day to explain that they needed the extra
> 500 million DM to satisfy all the competing demands.  I told them to forget it.
> Here again, Neuborne was a constructive influence, convincing Hausfeld to give
> in.  Hausfeld then backed away, agreeing to 10 billion if I could raise an
> additional fund from American corporations.  I foolishly said I hoped I could raise
> the equivalent of another 1 billion DM, or a half billion U.S. dollars, the figure
> Rintamaki had given me.
>
> They took this as a commitment but agreed to settle with the Germans now and
> hope I could raise the next later. . . .

(Id. at 256)

       Secretary Eizenstat telephoned Count Lambsdorff at 9:00 a.m. on Sunday, December 12,

1999, stating that he had a firm figure of DM 10 billion from the lawyers that the Count could take to Chancellor Schroeder.  At 5:00 p.m. Count Lambsdorff telephoned Secretary Eizenstat, informing him that the Chancellor wanted a letter from President Clinton confirming the lawyers agreement accepting the DM 10 billion and guaranteeing to end all legal action.  (Imperfect Justice at 256).

The agreement for a capped fund of DM 10 billion and for providing legal peace was memorialized in President Clinton's December 13 letter to Chancellor Schroeder and in Chancellor Schroeder's December 14 response.  A formal signing ceremony took place on December 17, 1999.  (Imperfect Justice at 258-59).

After the amount to be paid to the Foundation had been agreed upon, the German companies had to go about the difficult task of raising the DM 5 billion; the German government had to draft the legislation establishing and governing the Foundation; an agreement between the United States and the Federal Republic of Germany had to be drafted; and the various groups of victims had to agree upon allocation of the DM 10 billion.  Secretary Eizenstat described the allocation process:

> But the problems with the draft legislation paled by comparison with the three-month torment of deciding how to allocate the 10 billion DM.  Whatever semblance of unity there had been among the Eastern Europeans, plaintiffs' attorneys, and Claims Conference in persuading the Germans to pay the maximum possible broke into open warfare as they tried to divide the pie.  The process brought out the worst in everyone.
>
> . . .
>
> There were essentially three categories of claims that had to be satisfied.  First were those of conscripted workers.  The issue of how much should be allocated to each pitted Eastern Europeans against the Claims Conference.  Second was banking and insurance.  Here the principal battle engaged the class-action lawyers,

who fought for individual claimants seeking damages for Aryanized assets and unpaid life insurance policies, and the Claims Conference, which sought a large humanitarian fund to help Holocaust victims in general, since most of the claimant families had been killed by the Nazis.  And third was the Future Fund, so important to the German companies because it would identify them with project of tolerance and help them raise funds from German companies not implicated in World War II.

(Imperfect Justice at 261-62).

Count Lambsdorff and Secretary Eizenstat had hoped to remain uninvolved in these disputes.  However, it developed that their intervention was required to help resolve the differences between the various groups.  The differences were so vast and the parties so intransigent that, as Secretary Eizenstat put it, "My job was clear.  The only way to bring everyone together was for me to persuade Lambsdorff to forge a joint proposal and ram it down everyone's throat.  Even the lawyers were ready.  'Someone needs to break the tie, and we trust you to do it,' Neuborne told me.  So Lambsdorff and I set a 'make or break' session for Berlin for March 22-23.  We had to put an end to the haggling or let everyone know the entire enterprise would collapse."  (Id. at 264).

Before the "make or break" session, Count Lambsdorff and Secretary Eizenstat agreed on what they called the "Joint Chairman's Proposal."  There followed furious further discussions and secret understandings.  At the end of the day, as Secretary Eizenstat stated, "[w]e had the 10 billion DM.  We had agreed on how to divide it down to the last pfennig."  There remained the question of the mechanics of establishing legal peace, but the allocation was agreed upon.  (Id. at 268).

There was one aspect of the contentious efforts to reach agreement on the allocation of the DM 10 billion that Secretary Eizenstat did not refer to in Imperfect Justice.  It became

18

apparent during the bitter negotiations that agreement could not be reached within the DM 10

billion and that DM 100 million more would be needed to fund the amounts allocated to the

various categories of participants.  In March, 2000, rather than have the whole process break

down, GEFI and the German Government agreed that an additional DM 100 million would be

paid, but, in order to avoid affecting the agreed upon DM 10 billion cap and thus weaken GEFI's

fund raising efforts, and breaching the Government's and GEFI's commitment to the legislature

and public, the additional funds would be designated "interest."  This amount appears in Annex

B of the Joint Statement, which allocates the DM 10 billion plus precisely DM 100 million in

"interest."

> Secretary Eizenstat's counterpart, Count Lambsdorff, described the process as follows:
>
>> When it became clear that my American counterpart had incurred certain verbal
>> obligations with the two leading partners, the Polish Government and the World
>> Jewish Congress, which could be only matched by raising the Foundation
>> Initiative's contribution by 100 Mio. DM, after long and arduous talks the
>> Foundation Initiative agreed under the proviso that this additional amount did not
>> enter into the principal of the promised amount in public.  This was the genesis of
>> the word "interest", in reality covering the fact that so far the total does not
>> preclude the fact that once the sum was deposited in the Foundation's Account, it
>> generated a much higher interest than this sum and, as a matter of fact, the Future
>> Fund of the Foundation is meant to be financed perpetually from interest earned.
>
>> In regard to that issue, on April 19, 2000, I wrote the following in a letter to
>> Deputy Secretary Eizenstat: "In December 1999 the companies of the German
>> Foundation Initiative agreed to do everything to contribute the amount of 5 billion
>> DM to the Foundation capital, and in March this year they agreed to a specific
>> allocation of further 100 Mio. DM generated by interest.  Although the Initiative's
>> difficulties raising this substantial amount are well known and have been deplored
>> by the German Chancellor and myself publicly, I have no doubt that the Initiative
>> will finally succeed.

(Lambsdorff Decl. at Para. 12, 13).

Even though in December, 1999, all the participants had agreed, in accordance with the Clinton-Schroeder correspondence, that the obligation of the German Government and the German companies was limited to DM 10 billion, Secretary Eizenstat pressed for an agreement to accelerate payment of this sum or to pay interest on it in addition to the DM 100 million pending the attaining of legal peace through the dismissal of the American lawsuits.  For the laudable purpose of achieving greater compensation for the victims, Secretary Eizenstat vigorously pursued this objective, repeatedly submitting drafts of a Joint Statement that included provisions that the German company contribution of DM 5 billion would be a "present value" as of a specified date, or would be deposited in an interest-bearing account as of a specified date, or would earn interest from a specified date.  The German side uniformly rejected these proposals except that the German Government agreed that the initial portion of its DM 5 billion contribution would be made available to the Foundation by October 31, 2000, and the remainder of its contribution would be made available to the Foundation by December 31, 2000.

This strenuous, March to July, 2000, negotiating process over what was the equivalent of interest, is referred to in only a passing comment in Imperfect Justice:

> But Gentz's greatest concern was over timing of German industry's requirement to pay its 5 billion DM share of the 10 billion DM settlement.  To avoid delay, I had suggested a certain date, like January 1, 2001.  The Germans had rejected my suggestion, and in a major concession to them, I had reluctantly agreed that no payments would be required until all cases were dismissed.  (Id. at 276).

The participants continued negotiating the terms of the Joint Statement, reaching agreement on July 12, 2000, on the language that appeared in the final version of the Joint Statement signed on July 17, 2000.  Representatives of the United States and Germany signed the Executive Agreement, which, among other things, obligated the United States Government to file

20

an agreed-upon Statement of Interest in support of dismissal of any pending or future Nazi-era litigation. On or about October 19, 2000, an exchange of diplomatic notes brought the Executive Agreement into full force and effect.

On August 12, 2000, the German Bundestag enacted the Foundation Law establishing the German Foundation "Remembrance, Responsibility and the Future." On August 22, 2000, Professor Neuborne was designated by the United States as a trustee of the Foundation to occupy the vacancy set aside for a lawyer representing the victims. He joined Ambassador J.J. Bindenagel, the other United States designated trustee of the Foundation.

On or about August 30, the first meeting of the Board of Trustees of the Foundation took place in Berlin. On or about September 22, the second meeting of the Board of Trustees was held, at which the trustees elected three Directors to manage the day-to-day affairs of the Foundation and adopted a notice to victims and other programs.

On or about October 1, 2000, the German government transferred DM 2.5 billion to the Foundation. On or about December 1, 2000, the German government transferred an additional DM 2.5 billion to the Foundation.

The attorneys for the plaintiffs and for the defendants in the United States Nazi-era cases proceeded to seek their dismissal with prejudice in order to fulfill one of the provisions of the Joint Statement. On November 13, 2000, Judge Bassler permitted voluntary dismissal with prejudice of forty World War II-related cases against German industrial defendants, including eleven members of the Initiative[1]. Defendants' attorneys assured the court that the financial

---

[1] Several Plaintiffs refused to seek voluntary dismissal, requiring defendants to move for involuntary dismissal.

commitments contained in the Joint Statement would be honored.  See In re Nazi Era Cases Against German Defendants Litig., 198 F.R.D. 429 (D.N.J. 2000).

On or about December 8, 2000, and December 14, 2000, Chief Judge Mukasey of the Southern District of New York permitted dismissal with prejudice of German insurance cases.

The parties incurred a snag when they sought dismissal of the German banking cases pending before Judge Kram in the Southern District of New York.  Although on December 28, 2000, Special Master Charles Stillman recommended dismissal of these cases, on January 20, 2001, Judge Kram denied dismissal.  On March 28, Judge Kram denied a motion to reconsider her refusal to permit dismissal despite the fact that the Initiative's founding members issued press statements that they had volunteered to make up any shortfall in the German company contribution.

On May 12, 2001, the Court of Appeals for the Second Circuit issued a writ of mandamus directing Judge Kram to permit dismissal of the German banking cases.  On May 18 and 21, 2001, Judge Kram dismissed the German banking cases.

On May 30, 2001, the German Bundestag announced that "adequate legal security" had been achieved.  As of that date at least seven lawsuits against German companies arising out of the Nazi-era and World War II remained pending before United States courts.

On or about August 21, 2000, German companies had advanced DM 2.7 million to the Foundation for start-up costs, particularly for notice to potential claimants.  The German companies transferred additional funds to the Foundation beginning in June, 2001.

Controversy arose concerning GEFI's obligation to pay interest, on what Plaintiffs have referred to as "6000 independent contributions during the deferral period," and concerning a

22

credit Allianz and other companies received for contributions they made to the International Commission on Holocaust Era Insurance Claims.

Professor Neuborne, acting in his capacity as a trustee of the Foundation, filed litigation in the Eastern District of New York challenging the insurance credit and seeking to enforce his claim that additional interest was owing.  In December, 2001, the German insurance companies made an additional payment to the Foundation of DM 63 million.  The lawsuit was withdrawn without prejudice.

### III.  Procedural History

In June, 2002, Elly Gross and others filed their Complaint as third-party beneficiaries seeking recovery for breach of contract against the Initiative (GEFI) and against its founding companies.  They allege that Defendants are obligated to pay interest at the rate of at least 4% per annum on the unpaid balance of the Initiative's DM 5 billion obligation from and after July 17, 2000, the date of signing the Joint Statement, and that Defendants are obligated to pay to the Foundation all interest earned on approximately 6000 contributions the Initiative received from non-members of the Initiative.

In July, 2003, Bernard and Barbara Schwartz Lee brought a similar breach of contract action as third-party beneficiaries against Deutsch Bank AG and Dresdner Bank AG.  They allege that in December, 1999, the German companies agreed to pay interest earned on their DM 5 billion from December 14, 1999.  The Schwartz Lee complaint also includes a count alleging misrepresentation.

These complaints were assigned to Judge Bassler.  The Initiative and the Defendant corporations moved to dismiss the complaints pursuant to Fed. R. Civ. P. 12(b)(6) and argued, in

the alternative, that the claims were nonjusticiable, i.e., that the political question and act of state doctrines as well as principles of international comity necessitated dismissal.  In addition, the Defendants argued that Plaintiffs' complaints were barred by the doctrine of res judicata as well as Plaintiffs' inability to establish Article III standing.  In re Nazi Era Cases Against German Defendants Litig., 320 F. Supp. 2d 235 (D.N.J. 2004), rev'd sub nom. Gross v. German Foundation Indus. Initiative, 456 F.3d 363. (3d Cir. 2006).

Judge Bassler held that the court had diversity jurisdiction but did not have federal question or supplemental jurisdiction.  He found that venue was proper and that Plaintiffs adequately demonstrated that they had standing.

Judge Bassler addressed Defendants' res judicata argument.  In 2002, a California citizen filed a similar action in Widerynski v. Deutsche Bank AG, No.BC 274449 (Cal. Sup. Ct.), alleging, inter alia, that the same defendants named in the Schwartz complaint failed to timely contribute the agreed sum of DM 5 billion, thereby misappropriating interest due to the survivors of Nazi atrocities.  Among the grounds on which the California Court dismissed the complaint with prejudice was international comity, concluding "that the German Government has 'exclusive supervision of the Foundation and on the exclusive postwar intergovernmental resolution of matters arising out of the Nazi era'."  Gross, 320 F. Supp. 2d at 244.  Judge Bassler held that the Plaintiffs were not bound by this decision under the doctrine of res judicata and observed in a footnote that "[t]he Court notes that the Foundation's responsibility lies primarily in its efforts to distribute compensation to surviving Holocaust victims, not in how monies, including interest, owed it are calculated.  Therefore, Defendants' position that the German Government, specifically via the Ministry of Finance, has exclusive jurisdiction over the interest

24

issue is debatable." Id. at 244, n9.

Judge Bassler also addressed and rejected Plaintiffs' contention that Defendants' promise to make "appropriate" interest payments (including the disputed payments) induced the court to dismiss the class actions against the German companies. He noted that Plaintiffs' counsel recognized that the interest issue is ambiguous, and Professor Neuborne acknowledged that "reasonable people can disagree" over the interest issue embodied in Para. 4(d) of the Joint Statement. Judge Bassler concluded that "[c]learly German Industry made no misrepresentation to this Court as to any definable interest obligation." Gross, 320 F.2d at 248.

Judge Bassler turned to Plaintiffs' argument that the Joint Statement was a classic bilateral contract that the court should enforce. He noted that "[t]he Joint Statement places the Foundation 'as the exclusive remedy and forum for the resolution of all claims that have been or may be asserted against German companies arising out of the National Socialist era and World War II'." Id. He also noted that the Joint Statement did not delegate similar jurisdictional authority over Para. 4 obligations of governmental and other parties under the Joint Statement, including the obligations of the German Government and German industry to pay principal and interest contributions under Para. 4(d). He concluded, "[a]s such, Defendants' interpretation that the Joint Statement itself provides that the interest obligations are properly decided by the Foundation appears incorrect. Otherwise, the other directives listed in Para. 4 of the Joint Statement should also rest in the Foundation's 'exclusive remedy and forum[.]'. However, that conclusion is tenuous at best from a review of the other directives." Id. at 248-9.

Having expressed the foregoing opinions, however, Judge Bassler ultimately concluded that "[n]otwithstanding this Court's reservations over whether the Ministry of Finance does in

25

fact maintain exclusive jurisdiction over the interest issues, the Court is convinced that the political question doctrine precludes adjudication of whether additional interest is owed.  That both Germany and the United States have committed the resolution of this issue to diplomacy over litigation is supported not only by the above correspondence but, more importantly, by history."  Id. at 253.  Accordingly, Defendants' motion to dismiss on the ground of nonjusticiability was granted.

Plaintiffs appealed, and the Court of Appeals reversed.  Gross v. German Foundation Industrial Initiative, 456 F.3d 363 (3d Cir. 2006).  The Court held "that adjudicating the 'interest' dispute would not present a nonjusticiable political question."  Id. at 378.  The Court observed that "the 'interest' dispute is distinct from the underlying reparations claims, which led to the creation of the Foundation."  Id. at 381.  It further observed that "[t]he language [of the Berlin Agreements] supports the view that the claims for which the Foundation is the exclusive forum and remedy, and for which the United States is required to file a Statement of Interest, are reparations and restitution cases, and not the present 'interest' dispute."  Id. at 383.

As a part of its discussion of the political question doctrine the Court noted that "there is much to support the view of the German Foundation Industrial Initiative that the Joint Statement is a political document" and not a contract, id. at 385, but that "the parties' characterizations of the Joint Statement bear primarily on the merits of the 'interest' dispute and not the question of justiciability."  Id. at 386.

The Court also rejected Defendants' arguments that the District Court should have restrained from adjudicating the claim under the act of state or international comity doctrines.  The Court reversed and remanded the case for further proceedings, observing:

> In adjudicating the case a court would have to interpret the Berlin Accords - specifically, Section 4(d) of the Joint Statement - to determine whether there is a binding, contractual "interest" obligation. A court would face at least two questions on the merits of this dispute: (1) is the Joint Statement, or part of the Joint Statement, enforceable as a private contract, and (2) if so, what "interest" obligation, if any, did the parties intend for the German Foundation Industrial Initiative?

Gross, 456 F.3d at 387.

The case was remanded and, upon Judge Bassler's retirement, reassigned. The parties in each of the cases conferred with the Court and filed four dispositive motions: i) the Gross Plaintiffs' motion for summary judgment; ii) the Schwartz Lee Plaintiffs' motion for partial summary judgment; iii) the Gross Defendants' motion to dismiss the Gross complaint for failure to state a claim; and iv) the Schwartz Lee Defendants' motion to dismiss the Schwartz Lee Complaint.

There were renewed pending motions to dismiss for lack of jurisdiction over the person filed on behalf of Defendants Allianz AG, BASF AG, Bayer AG, BMW AG, Commerzbank AG, DaimlerChrysler AG, Degussa AG (sued as "Degussa-Huells AG"), Deutsche Bank AG, Deutz AG, Dresdner Bank AG, RAG AG, Robert Bosch GmbH, ThyssenKrupp AG (sued as "Friedr, Krupp AG Hoesch Krupp"), Siemens AG and Volkswagen AG.

The Federal Republic of Germany moved in each case for leave to appear amicus curiae.

## IV. **Gross Plaintiffs' Summary Judgment Motion**

The <u>Gross</u> Plaintiffs have moved for summary judgment. The reasons they advance to support their interest claims differ somewhat from those of the <u>Schwartz Lee</u> Plaintiffs, and, although they rely upon substantially the same evidence to support their respective claims, they interpret the evidence somewhat differently. Basically, however, their claims will rise or fall together.

A. <u>The Gross Plaintiffs' Contentions</u>: The <u>Gross</u> Plaintiffs allege that Paras. 4(a) and 4(d) of the Joint Statement constitute a legally binding contract obligating Defendants to pay interest on the DM 5 billion from July 17, 2000, the date of signing the Joint Statement, until payment of that sum to the Foundation, at the rate of 4% per annum. According to Plaintiffs, Para. 4(d) provides for a guaranteed DM 100 million interest on the DM 5 billion obligation in connection with a deferral period estimated by the parties on July 17, 2000, to be approximately six months, which translates into annual interest at 4%. Because the deferral period extended much longer than the parties anticipated, interest for that period, according to Plaintiffs, is owed in an amount far greater than DM 100 million. Further, Plaintiffs contend that, because Defendants failed to make full payment on or shortly after May 30, 2001, when they claim the DM 5 billion payment was due, under Section 288(2) of the German Civil Code, interest is owing on the amounts in breach at 8% above the German market rate as calculated under Section 247 of the German Civil Code.

In addition, Plaintiffs assert that, during the deferral period, more than 6,000 small businesses, individuals, and institutions having no connection with Defendants' unlawful World War II activities contributed funds to the Foundation and that the Initiative used interest on the

6,000 contributions to defray a portion of its DM 5 billion financial obligation to the Foundation. Plaintiffs seek summary judgment ordering Defendants to account for that interest and to pay it to the Foundation.

The Joint Statement is unique in that it is an undertaking signed by 36 private entities[2], as well as by eight nations, and, if fully implemented, would result in dismissal with prejudice of pending litigation between private parties, in return for the payment of governmental and private funds. The specific obligations of the German companies are set forth in Para. 4(a) (to contribute DM 5 billion to the Foundation), and Para 4(d) (to make the contribution "once all [designated] lawsuits against German companies . . . pending in U.S. Courts . . . are finally dismissed with prejudice by the courts," and "to make available reasonable advanced funding to provide appropriate publicity . . ." and to continue to collect funds "on a schedule and in a manner that will ensure that the interest thereon before and after their delivery to the Foundation will reach at least 100 million DM.") Para. 4(g) sets forth the obligation of the Plaintiffs to file motions or stipulations to dismiss with prejudice all lawsuits they have filed currently pending in United States courts against German companies arising out of the National Socialist era and World War II.

Other paragraphs of the Joint Statement contain the undertakings of Germany, the United States, the participating Central and Eastern European states, and Israel. Plaintiffs contend that, even though the obligations of the government parties cannot be enforced in a court of law, the mutual undertakings of the private parties are enforceable as a binding contract, with the state

---

[2] Dr. Manfred Gentz signed the Joint Statement on behalf of GEFI's then-16 corporate members. Robert Bosch GmbH subsequently joined GEFI. Nineteen private lawyers signed the Joint Statement.